Davis *v.* Asquini and American Casualty Company,
Appellants.

Argued April 23, 1934.

Before Trexler, P. J., Keller, Cunningham, Baldrige, Stadtfeld, Parker and James, JJ.

*Wm. W. Matson,* and with him *Harold E. McCamey* and *Hamilton A. Robinson* of *Dickie, Robinson & McCamey,* for appellant.

*Mead J. Mulvihill,* and with him *Robert L. Wallace,* for appellee.

Opinion by Cunningham, J., July 13, 1934:

On December 30, 1929, Sidney L. Davis, the claimant in this Workmen's Compensation Case, while engaged in the course of his employment as a carpenter with John Asquini, accidentally fell a distance of about sixteen feet from a scaffold. In the language of Dr. C. A. Duffy, the physician who first saw him, his injuries were: "A compound comminuted fracture of the left tibia and fibula above the ankle and a crush-

ing type of fracture of the right oscalcis—heel bone.''

The parties, including the employer's insurance carrier, entered into an open agreement, on January 20, 1930, for the payment of compensation for disability from January 7, 1930, at the maximum rate under Section 306 (a) of the Workmen's Compensation Act of June 2, 1915, P. L. 736, as amended by the Acts of June 26, 1919, P. L. 642, and April 13, 1927, P. L. 186—$15 per week. In this agreement the description of the accident and resulting injury read: ''Lost balance and fell from scaffold, fracturing right leg.'' No explanation has been given of the failure to refer in this agreement to the injury to claimant's left leg. However, as he was paid compensation for total disability under this agreement from January 7, 1930, to August 9, 1930, he has not been harmed by the omission.

On the last mentioned date a supplemental agreement was executed in which it was provided that claimant should be paid at the maximum weekly rate for the definite period of 150 weeks, provided in Section 306 (c), for the permanent loss of the use of his left foot; this period ended November 21, 1932. In this agreement the description of his injuries was: ''Lost balance and fell from scaffold fracturing left leg and injuring right leg.''

On September 25, 1930, claimant petitioned for the commutation of the balance of compensation due him under the supplemental agreement in order to enable him to buy a chicken farm at Mars, Pa., and on February 4, 1931, after several hearings, the petition was granted on the basis of fifty-seven weeks already paid at $15 per week, or $855, and ninety-three weeks, commuted at $1,335.24, or a total of $2,190.24.

Under date of February 11, 1931, claimant executed a final settlement receipt for this amount, covering a

period of 150 weeks and "for all injuries received by [him] on or about the 30th day of December, 1929." This agreement and payment compensated him for "all disability" up to November 21, 1932.

On October 19, 1932, (a date within the 150 weeks' period, but more than one year after the payment of the commuted amount) claimant filed a petition for "modification" of the agreement upon the ground that his "disability ...... had increased." The specific averment reads: "Still have disability to right leg which was injured the same time as left leg." Defendants raised an issue of fact by answering that "claimant received no injury to the right leg."

The petition and answer were referred to Referee Christley. At the hearing before him on January 18, 1933, counsel for defendants moved to amend their answer by including an averment that as "the final payment in accordance with the terms of the commutation was made on February 11, 1931," the petition was too late because it had not been filed within one year after the date of the last payment of compensation. The referee overruled defendants' motion to dismiss the petition and took the testimony of claimant and of Doctors C. A. Duffy and G. F. Berg. At the conclusion of the first hearing it was agreed that the referee should appoint a disinterested, impartial orthopedic surgeon to examine claimant, at the expense of defendants; Dr. E. W. Fiske was appointed and examined and cross-examined at a subsequent hearing.

The referee's eleventh and a part of his twelfth findings of fact read:

"Eleventh: From a consideration of all the testimony in the case' it is our opinion that the claimant as a result of the accident complained of sustained the loss of the use of his left foot, and, in the same accident, he sustained injuries to the right foot which have

resulted in the permanent loss of the use of his right foot, confined, however, below the knee.

"Twelfth: It is our opinion that the claimant has been and is wholly incapable of carrying on as a competitive worker for anything that he is physically equipped or qualified to do. He is aged 54 years and it is our opinion that while the claimant was given a commutation in the hope that he might rehabilitate himself and improve his condition by exercise, yet, we are convinced that he has cooperated in the fullest but that he has been unable to, at any time since the accident, engage in any remunerative employment and that his income from the chickens, of whatever character or nature, has been in the nature of an income from investment rather than from any labor or work which the claimant has been or is able to perform. It is our opinion, therefore, that the claimant as a result of the accident complained of is permanently and totally disabled."

Based upon these findings the referee made an award for total disability, at the rate of $15 per week, for a period of 433⅓ weeks, or the sum of $6,500,— the maximum amount authorized in Section 306 (a)— the defendant, however, to take credit for 150 weeks, at $15 per week, or $2,250, leaving a balance due of $4,250, with interest and specified costs.

Upon defendants' appeal to the board, the award was affirmed apparently upon the theory of the "loss of both feet," constituting total disability, rather than of the loss of the use of "two members," not amounting to total disability, but entitling claimant, under Section 306 (c), to compensation "during the aggregate of the periods specified for each."

When appealed to the common pleas, the case was argued before Moore, Patterson, and Egan, J. J., and in an opinion, written by Moore, J., the defendants'

exceptions were dismissed and judgment entered upon the award. From that judgment they have taken the present appeal.

The argument at bar, and particularly in behalf of claimant, took a wider range than the record warrants. This was probably due to a statement in the opinion of the court below to the effect that "the testimony supports the finding that the original and supplemental agreements were based upon a mistake of law and fact existing at the time said agreements were made." No such findings were made by the compensation authorities, nor was such contention suggested in any way either in the petition or in the testimony.

It seems to have been injected as a ground for bringing the petition under the first paragraph of Section 413 of the original Act of 1915, as amended by the Acts of 1919 and 1927, supra, and thereby avoiding the limitation of one year in the second paragraph. The petition was based upon an alleged change in claimant's physical condition; namely, that his disability had increased, or, at least, that at the time of its filing he had a disability, due to the condition of his right leg, which was separate, apart and distinct from the disability occasioned by the injury to his left leg.

The two questions actually involved in this appeal are: (a) Whether consideration of the petition, under the second paragraph of Section 413, was barred because it was not filed within one year after the date of the payment of the commuted portion of the compensation; and (b) Whether there was sufficient competent evidence to sustain the finding of the compensation authorities that claimant was "permanently and totally disabled" at the date of the award.

As stated by this court in Zupicick v. P. & R. C. & I. Co., 108 Pa. Superior Ct. 165, 164 A. 731, in which

the cases are reviewed, "This [second] paragraph covers changes that have occurred in the claimant's physical condition since the agreement was entered into or terminated. The first paragraph does not. This second paragraph was affected by the amendment of 1927,—except as to eye injuries—by fixing a time limit within which the review, modification and reinstatement could be applied for, viz., as to agreements or awards under Section 306 (c), which were for a definite period, during the time the agreement or award was to run; as to all other agreements or awards—except eye injuries—within one year after the date of the last payment of compensation." The supplemental agreement in this case was for a definite period of 150 weeks and the petition was filed before the expiration of that period. In our opinion, the fact that payments for the latter portion of the period were commuted more than one year before the filing of the petition did not affect claimant's right to have his petition considered and disposed of.

The second question, i. e., whether there was sufficient competent evidence to support the finding of total disability, raises the serious issue in this case. An excerpt from claimant's own testimony, given on November 13, 1930, in support of his application for commutation, reads: "Q. And you are not totally disabled, are you? A. No. Q. You are not getting compensation for total disability? A. No, just the loss of a foot. Q. Which of course, more or less incapacitates you from carrying on other forms of work? A. I am not able to follow the building business, no." At the hearing in January, 1933, upon his petition for review, the claimant gave this apparently contradictory testimony relative to his physical condition: "Q. At any time after the agreements were entered into, particularly the supplemental agreement for the loss of your left leg, has your [right] leg been any

better than your left? A. No. Q. Was it better or worse? A. Worse than the left one. The left leg became fixed so far as I could stand or swing my weight on it. I cannot do that with my right foot." Upon cross-examination by the representative of the insurance carrier the claimant said: "Q. You recall when this [supplemental] agreement was entered into for the loss of the use of the left foot, we both had knowledge of the injury to the right foot? A. Yes, sir. Q. And that was considered when we agreed to allow you for the loss of the left foot? A. I do not know that. Q. You did read the supplemental agreement where it was mentioned. A. I believe I did. ......
Q. And it was your idea, if you got this chicken place you could make a living on it? A. Yes, at least I could help make one. The boy was going to help me all he could until I could do things for myself. Q. Have you had any treatment from the doctors since you were discharged from the Southside Hospital? A. No. ...... The way I came to make that agreement—I went to the Rehabilitation Bureau and Mr. Haering told me the best thing you can do is to make application for the loss of one leg and if, by the time that runs out, the other foot is not better and still bothers you, you can come back and make petition for compensation to go on from that date. That is the reason I made it."

There is no evidence of any change in claimant's physical condition, except for the better, between the dates of the hearings. It is difficult to avoid the impression that the petition for review was prompted more by the excessive mortality among the chickens than by any real increase in claimant's disability.

Dr. C. A. Duffy, who had charge of claimant immediately after the accident, testified he had not examined him since July or August of 1930 but at that

time he had a disability of about twenty per cent in his right foot; that his opinion then was claimant could never be a carpenter again but could do something such as running an elevator or working in a sitting position.

Dr. G. F. Berg examined claimant the day before the hearing; portions of his testimony read: "Q. As a result of your examination do you feel, eliminating the condition in the right foot, that there is an industrial loss of use of the left foot? A. Not a total loss. Q. If you eliminate the injury to the right foot, what is the percentage? A. About 25 per cent. Q. Owing to the fact that he has had injuries to both feet would you consider that he has lost the industrial use of one of them? A. Adding the two together. Q. Yes, sir. A. I think that would be a fair conclusion. ...... By the referee: Q. I believe you have testified that in your opinion if the claimant had a normal left foot the disability in the right foot as a result of this accident would be approximately 20 per cent? A. Twenty to twenty-five per cent. ...... Q. In your opinion can this man today follow the work of a carpenter? A. He can do some work but I do not think he could do a whole lot of walking on account of both legs. Q. Do you think he could be on his feet for a full day's work? A. No, not standing unless he put braces on; the left foot needs support. ...... Q. Do you think that the left foot is in better shape today than the right foot, so far as his ability to work and earn a living is concerned? A. Yes, sir, for the simple reason that the union is firm even though in mal position and nature has adapted the astragular surface of the various joints and ligaments and muscles to this mal position." Later in his testimony, Dr. Berg stated claimant can do certain types of work but could not stand all day; that he could, in his pres-

ent condition, do "bench work;" and that in his opinion claimant's condition will improve as time goes on.

At a continued hearing Dr. E. W. Fiske, appointed, as stated, by the referee, was called. After a technical statement relative to the extent of claimant's injuries, he expressed the opinion "that this man sustained a total disability for heavy work from the injury to the right foot entirely irrespective of the injury to the left and that this will continue to constitute a total disability for heavy work until such treatment is instituted as will correct the deformity and allow weight-bearing without pain." Later, he stated that if claimant had a perfectly normal left foot, the injury to the right would not permit him to engage in manual labor requiring him to be on his feet for any considerable time and that he does not have a useful right foot for industrial purposes. On cross-examination his testimony was modified to some extent. An excerpt reads: "Q. Would you call the condition of his right foot at the present time 100 per cent loss of the use of the foot? A. Not for light work. . . . . . . Q. The facts are these: This man in February, 1931, obtained a lump sum payment for the loss of the use of his left leg on the statement that he intended to go into the chicken raising business. That money was applied to the purchase of a farm on which he could raise chickens. Since that time he is supposed to be devoting himself to raising chickens. Would you say he has been unable to do that kind of work? A. This man is able to walk and undoubtedly could get himself about the farm or some place he owned himself where he didn't have to hurry and get about but could take his time and rest when he wanted to. Don't think he could work for somebody else."

We think the only legitimate inference from the testimony as a whole is that claimant is not able to do the particular kind of work in which he was engaged

when injured, or any kind of "heavy work," but, under his own testimony, is able to supervise the work on the chicken farm, wash the eggs for marketing, pick chickens, etc., and engage in various forms of light work in which he has had experience.

In our opinion there is not sufficient competent evidence to support the finding that he is "permanently and totally disabled." (Cf. Sharcheck v. Beaver Run Coal Co., 275 Pa. 225, 119 A. 135.)

On the other hand, there is ample evidence that claimant, at the expiration of the 150 weeks' period and at the date of hearing, had a partial disability, separate and distinct from the disability occasioned by the injury to his left foot, and that this partial disability is attributable to the injury to his right foot.

This case is, therefore, comparable with that of Barlock v. Orient Coal & Coke Co., 114 Pa. Superior Ct. 228, 173 A. 666, and, for the reasons there stated, we are of opinion that this claimant is entitled to compensation for such partial disability during its existence, but not beyond 300 weeks after January 7, 1930, —the seventh day after the accident.

Under this conclusion, it becomes necessary for us to remit the record to the court below so that it may be returned to the board to ascertain the extent of the partial disability, as of November 21, 1932, (the end of the definite period under 306 (c) ) and to make an award therefor, under 306 (b) and in accordance with the principles herein stated.

The judgment of the court below, entered October 6, 1933, is reversed; the record is remitted for further proceedings not inconsistent with this opinion.